## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID SORIA, M.D. AND DAVID DARRIGAN, D.O., TP HOLDCO, LLC, A FLORIDA LLC, TRUE PARTNERS EMERGENCY PHYSICIANS, LLC, A FLORIDA LLC, EMERGENCY SPECIALISTS OF WELLINGTON LLC, A FLORIDA LLC, TRUEPARTNERS WESTLAKE EMERGENCY SPECIALISTS LLC, A FLORIDA LLC, TRUEPARTNERS RANCH EMERGENCY SPECIALISTS LLC, A FLORIDA LLC, TRUEPARTNERS MANATEE EMERGENCY SPECIALISTS LLC, A FLORIDA LLC, TRUEPARTNERS LAKEWOOD INPATIENT SPECIALISTS LLC, A FLORIDA LLC, TOWN SQUARE EMERGENCY ASSOCIATES, PLLC, A TEXAS PLLC, TRUEPARTNERS NORTHWEST EMERGENCY ASSOCIATES, PLLC, A TEXAS PLLC, TEP SELECT EMERGENCY SPECIALISTS, PLLC, A TEXAS PLLC, TEXOMA EMERGENCY PHYSICIANS, PLLC, A TEXAS PLLC, & TRUEPARTNERS COMANCHE EMERGENCY SPECIALISTS LLC, AN OKLAHOMA LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Plaintiffs* | ) ) C.A. No.: 1:24-cv-00692-GBW |
| v. | ) ) |
| APP HOLDCO, LLC, JOHN RUTLEDGE, TONY BRININGSTOOL, ANDY MCQUEEN, CPV APP BLOCKER, LLC., BROWN BROTHERS HARRIMAN CAPITAL PARTNERS V, LLC, BROWN BROTHERS HARRIMAN CO., BROWN BROTHERS HARRIMAN & CO., BROWN BROTHERS HARRIMAN CAPITAL PARTNERS, L.P., BRENTWOOD CAPITAL PARTNERS, L.P. II, BRENTWOOD CAPITAL ADVISORS, LLC, & BRENTWOOD EQUITY MANAGEMENT, LLC. | ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants* | ) ) |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

1

## I.  <u>INTRODUCTION</u>

1.      Plaintiff Soria was the sole shareholder and owner of eleven medical companies that served emergency departments (hereinafter "EDs") in several hospitals in Texas, Oklahoma, and Florida. They are: (i) True Partners Emergency Physicians, LLC, a Florida limited liability company, (ii) Emergency Specialists of Wellington LLC, a Florida limited liability company, (iii) TruePartners Westlake Emergency Specialists LLC, a Florida limited liability company, (iv) TruePartners Ranch Emergency Specialists LLC, a Florida limited liability company, (v) TruePartners Manatee Emergency Specialists LLC, a Florida limited liability company, (vi) TruePartners Lakewood Inpatient Specialists LLC, a Florida limited liability company, (vii) Town Square Emergency Associates, PLLC, a Texas professional limited liability company, (viii) TruePartners Northwest Emergency Associates, PLLC, a Texas professional limited liability company, (ix) TEP Select Emergency Specialists, PLLC, a Texas professional limited liability company, (x) Texoma Emergency Physicians, PLLC, a Texas professional limited liability company, and (xi) TruePartners Comanche Emergency Specialists LLC, an Oklahoma limited liability company. Plaintiff Darrigan was a medical director for one of the above-mentioned companies.

2.      Between 2011 and 2019, Plaintiff Darrigan grew Soria's company from the original single company at Wellington Memorial in Wellington, Florida, into the eleven entities he and Soria operated before the sale to APP Holdco, LLC. Darrigan started working with Soria in November of 2011, at Texoma Medical Center. At the time, Soria recruited Darrigan to help him grow the Texoma business. Instead, Darrigan grew TruePartners into a nationally recognized company. Darrigan obtained and operated every contract of TruePartners, except Soria's original contract at Wellington, Florida. After the sale to APP Holdco, LLC, Darrigan was contracted to continue as

medical director over all of the TruePartners contracts but was also tasked with taking on additional APP contracts.

3.      On November 11, 2011, Darrigan secured the contract for Texoma Medical Center, Denison Texas, the ER of Sherman, Sherman Texas, and the ER of Anna, Anna Texas. In April of 2017, Darrigan secured the Northwest Texas Healthcare Center, in Amarillo, Texas, the Northwest Emergency on Georgia, in Amarillo, Texas, and the Northwest Emergency at Townsquare, in Amarillo, Texas. In May of 2018, Darrigan secured the Comanche County Memorial Hospital, in Lawton, Oklahoma. In April of 2019 Darrigan secured the Golden Valley Memorial Hospital, in Clinton, Missouri, the ER at Westlake, in Wellington, Florida, and the Wellington Memorial Hospital, in Wellington, Florida. In June of 2019, Darrigan secured the Manatee Memorial Hospital, in Manatee Florida, the ER at Bayshore Gardens, in Bradenton Florida, the ER and the ICU at Sun City Center, in Wimauma, Florida, the Lakewood Ranch Medical Center, in Lakewood Ranch, Florida, and the ER and the hospitalist program (inpatient medicine) at Fruitville, in Sarasota, Florida.

4.      On October 25, 2019, APP Holdco, LLC, and its sponsors[1], principals, managers, officers, agents and directors[2], along with its subsidiary American Physician Holdings, LLC, defrauded Soria and Darrigan into selling their medical companies to APP Holdco, LLC for use in American Physician Partners, LLC's (hereinafter "APP") portfolio and accepting cash and also "Physician Units" in APP Holdco, LLC (shares that were essentially worthless, did not have voting rights,

---

[1] Each Company Sponsor Unit holder in APP Holdco, LLC and CPV APP Blocker, LLC were merely agents for their private equity firm, or private investment firm, owners, Brown Brothers Harriman & Co.

[2] CPV Blocker APP, Inc., (individually and as the agent for Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman Co., L.P., Brown Brothers Harriman & Co. L.P., Brown Brothers Harriman Capital Partners, L.P) Brentwood Capital Partners, L.P. II (individually and as agent for Brentwood Equity Management, LLC), Brentwood Capital Advisors, LLC, John Rutledge, Tony Briningstool, and Andy McQueen.

and that caused the Plaintiffs to be personally liable for phantom income each year worth tens of millions of dollars).

5.     Each of defendants, agents, managers, sponsors, officers, and directors of APP Holdco, LLC, and as agents, managers, sponsors, officers, and directors of CPV APP Blocker, Inc. (APP Holdco, LLC's majority Sponsor Unit holder and the majority Sponsor Unit Holder in APP at the same time), presented false revenues, false financials, and false warranties to the Plaintiffs at an airport hotel meeting in Dallas, Texas, as well as in the purchase agreement, in exchange for the transfer of the above companies to APP Holdco, LLC, for transfer to American Physician Holdings, LLC, but for ultimate use in APP's portfolio. In public, APP referr    ed to itself and its affiliates as a single medical group:

> "American Physician Partners ('    APP'    or the '    Company'    ) is the fastest growing, scaled emergency department management platform in the U.S. Platform has grown to serve ~155 contracts across 17 states and ~4 million patients annually since the Company's founding in 2015."

6.     In conspiracy with each other, as directors and as Sponsor Unit Holders of CPV APP Blocker, Inc., and as directors and as Sponsor Unit Holders of APP Holdco, LLC (the two controlling entities for APP), each of the sub-agent and/or agent Defendants, and their principals Defendants, agreed to direct APP Holdco, LLC to buy each of Plaintiffs' emergency room companies with borrowed money, creating massive debt, then placing the debt on the books of APP Holdco, LLC—without the equity, which was listed on APP's portfolio but owned by American Physician Holdings, LLC—while approving the below language in the Purchase Agreement that promised APP Holdco, LLC and American Physician Holdings, LLC    :

> "…are each duly licensed or qualified to conduct business as a foreign limited liability company and are each in good standing in each jurisdiction where the character of their properties owned or held under lease or the nature of their activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not, with respect to each of the Buyer and

Parent, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer, Parent or their respective operations." PA at §6.1.

"…have all necessary power and authority to execute, deliver and perform their obligations under this Agreement and each of the other Transaction Documents to which either of Buyer or Parent is a party and to consummate the Contemplated Transactions… No other limited liability company or other action on the part of Buyer or Parent or any of their members is necessary to authorize the execution and delivery by Buyer or Parent of this Agreement and the other Transaction Documents to which either Buyer or Parent is a party, the performance of Buyer's and Parent's obligations hereunder or thereunder or the consummation by Buyer and Parent of the Contemplated Transactions." PA at §6.2.

and further promised that:

"The execution and delivery of, and the performance of their obligations under, this Agreement by Buyer and Parent do not, and the consummation by Buyer and Parent of the Contemplated Transactions or by any of the other Transaction Documents to which Buyer or Parent is a party will not… result in a violation of… any material laws…applicable to Buyer, Parent, or any of their assets, properties, or businesses …" PA at §6.3.

"There are no Governmental Orders to which Buyer, Parent or any of their Affiliates, or any of their respective assets, properties or businesses is subject or bound, that would reasonably be expected to adversely affect in any material respect the ability of Buyer or Parent to enter into, perform its obligations under and consummate the Contemplated Transactions." PA at §6.4(c).

"Buyer and Parent shall (a) be able to pay their respective debts as they become due; (b) own property which has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on their respective businesses." PA at §6.6.

"Except as would not have a Material Adverse Effect, Buyer and Parent are, and since January 1, 2018 have been, in compliance with Healthcare Laws." PA at §6.9.

7.      Each of these promises was false and/or breached by APP Holdco, LLC, its director and principles, and American Physician Holdings, LLC, who were in conspiracy amongst themselves and amongst their managers, directors, Sponsor Unit Holders, as well as those Sponsor Unit Holders' principals, to include these promises to fraudulently induce the Plaintiffs into agreeing to the sale of the eleven companies listed above.

8.      After the sale to APP Holdco, LLC, in December of 2019, Defendants Rutledge, Briningstool, and McQueen requested Darrigan to continue securing additional ERs for the medical group. These three Defendants agreed to pay Darrigan additional compensation for the acquisition of any additional new ER contracts, beyond the listed contracts in the purchase agreement. The defendants promised the consideration would be equal to the consideration set forth in the purchase agreement:

> "For purposes hereof, the ' Additional Consideration' shall mean, for any New Contract, (i) if such New Contract is executed on or before the one-year anniversary of the Closing Date, an amount equal to 2.5 multiplied by New Contract EBITDA; (ii) if such New Contract is executed following the one-year anniversary of the Closing Date and on or before the two-year anniversary of the Closing Date, an amount equal to 1.75 multiplied by New Contract EBITDA; and (iii) if such New Contract is executed following the two-year anniversary of the Closing Date and on or before the three-year anniversary of the Closing Date, an amount equal to New Contract EBITDA." Purchase Agreement at p.17.

9.      Believing he would be paid additional consideration, in August of 2020, Darrigan secured the ER contracts at Lake Granbury Medical Center, in Granbury, Texas. In April of 2021, Darrigan secured the Banner Desert Medical Center, in Mesa, Arizona. When Darrigan requested the additional consideration, Rutledge, Briningstool and McQueen told him the payment would be made, but to date they have failed and refused to make any additional consideration to Darrigan.

### A. Breaches of the Contract and Fraudulent Inducement Based on the Terms of the Contract

10.     First, the Texas Medical Practice Act, the Oklahoma Corporate Practice of Medicine doctrine, and their related statutes, prohibit the corporate practice of medicine, which means that only entities owned and controlled solely by licensed physicians can own other medical practices. As such, the Contracting Defendants (APP Holdco, LLC and American Physician Holdings, LLC) breached the contract between the parties, while their controlling Defendants conspired with them to do so in order to defraud the Plaintiffs into accepting the sale of their medical companies.

11.     Second, the contracting defendants' promises that APP Holdco, LLC and American Physician Holdings, LLC owned property with a value over and above their debts, and that they were both solvent, were untrue. The Contracting Defendants breached the contract, while their controlling private equity Defendants, and their agents and sub agents, conspired with the Contracting Defendants to keep that language inserted into the purchase agreement in order to fraudulently induce the Plaintiffs into accepting the sale, and into accepting the tax-burdened Physician Units in place of cash.  In reality, APP Holdco, LLC posted a net income LOSS of $147.6 million in 2019. That was followed by net income losses of $131.6 million and $114.6 million in 2020 and 2021. Those numbers were not disclosed to the Plaintiffs before they accepted those Units, but the promise of solvency was.

12.     Furthermore, all of these Defendants, in conspiracy with one another, planned to run up as much debt as possible, directing APP Holdco, LLC to purchase approximately one hundred more medical companies after it purchased     the eleven in issue in this case, immediately transferring the medical companies to American Physician Holdings, LLC while keeping the debt on APP Holdco, LLC's books, thereby causing the Physician Units received by the Plaintiffs to stay worthless from the time they received them to the present.

13.     From January of 2020 to June of 2023, these Defendants continued to misrepresent the financial solvency of these companies to the Plaintiffs while they continued diverting distributions to     the Contracting Defendants and their directors, and to the Private Equity Defendants, Brown Brothers Harriman Capital Partners, L.P., Brown Brothers Harriman & Co., and Brentwood Capital Advisors.

14.     Eventually in June of 2023, these defendants, while in complete control of APP Holdco, LLC, CPV APP Blocker, LLC, and APP, in conspiracy with one another, and after there was no

more equity or liquidity to divert to themselves and their private equity and private investment

firm Defendants, began offloading all of the medical companies to whoever would take them,

before sending APP and its hundreds of shell PLLCs and LLCs created from 2015 to the present

into c   hapter 11 bankruptcy    liquidation.

15.     As part of their practice, these Defendants left Physician Unit Holders with massive

phantom income tax liabilities that exceeded the initial cash payments given to them in exchange

for their companies.

16.     Third, the Purchase Agreement included a non-compete for Soria. Darrigan's non-compete

was included in a separate document signed simultaneously with the purchase agreement. The

Soria Purchase Agreement's non-compete included the following restrictive covenant:

> "Executive agrees that, during the Term of this Agreement and for two years
> thereafter (the '   Restricted Period'   ) (except that if a court finds that a two-year
> period is not reasonably necessary to protect the legitimate business interests of the
> Company, the "Restricted Period" hereunder shall be the term of this Agreement
> and for one year thereafter), Executive shall not, directly or indirectly, for himself
> or on behalf of any other person or entity, solicit or attempt to solicit any hospital
> with which American Physician Partners, LLC, a Delaware limited liability
> company ('   APP'   ), the Company, their respective affiliates and companies
> managed by APP, has contracted to provide emergency medicine services or any
> other hospital located in any county in which the Company or its affiliates do
> business throughout the Term without the prior written consent of APP.
> Notwithstanding the foregoing, nothing in this Agreement shall prohibit Executive
> from advertising Executive's medical services or engaging in the practice of
> medicine after Executive is no longer employed by the Company." *See* Purchase
> Agreement at Exhibit C, pp. 5-6.

17.     Darrigan's non-compete stated:

> "During the Term and for one (1) year thereafter, except as otherwise set forth
> below, Physician shall not directly or indirectly solicit or interfere with any
> relationship or agreement of the Practice or any affiliates, subsidiaries, managing
> entities or managed entities thereof with any of the Facilities, including (i)
> encouraging or inducing in any way any Facility or employee or contractor of the
> Practice to terminate or modify in any way their relationship with the Practice or
> any of its affiliates or (ii) except through the Practice, providing or agreeing to
> provide medical services at any of the Facilities."

18.     However, the Texas Medical Practice Act, and Title 59 of the Oklahoma Statutes contain specific statutes prohibiting a medical PLLC from being directed by non-licensed physicians, non-physician owned company from employing physicians, or from requesting them to sign non-compete agreements. Accordingly, the contracting defendants, and their controlling private equity and private investment defendant controllers, breached the contract and conspired to fraudulently induce the Plaintiffs into accepting an illegal sale.

19.     Fourth, the purchase agreement, at its Exhibit E also stated:

> "Upon the Initial Subscription, for purposes of and in accordance with the LLC Agreement, the amount of Investor's initial Capital Contribution (as defined in the LLC Agreement) to the Company in consideration of such Physician Units attributable thereto shall be $4.50 per Physician Unit (the "Initial Subscription Purchase Price")."

20.     However, at the time that statement was made, the Physician Unit value was *negative* $1.26. Indeed, the company had a loss of $147,600,000.00 in net income that year.

21.     Fifth, the purchase agreement promised Plaintiffs "tail insurance" coverage, which covers malpractice claims that are filed months, or even years, after physician care was rendered. It is essential for a physician to operate his or her practice and was a determining factor for Plaintiffs to sell their medical group to APP Holdco, LLC and CPV APP Blocker, LLC, and both of their principals and alter egos. APP Management Co, LLC promised:

> "The Company, at its expense, with the cooperation of Executive, will procure professional liability insurance, including tail coverage or post termination coverage, as applicable based on the Company's insurance policy, covering services rendered by Executive pursuant to this Agreement in sufficient limits as required by applicable state law or a facility's medical staff bylaws." ¶10 to Exhibit C of the Purchase Agreement.

22.     The Contracting Defendants completely controlled and operated APP Management Co, LLC, one of the hundred APP-named companies they used to circumvent CPOM laws. In agreement and conspiracy with the principal private equity defendants and their agents and their

9

sub-agents acting as directors for the Contracting Defendants, Defendants directed their alter ego and agent APP Management Co, LLC to refuse this insurance coverage to any of the ED medical companies they purchased from Plaintiffs.

23.    Sixth, APP Holdco's alter ego and agent, APP Management Co., LLC refused to secure tail insurance for Soria and Darrigan—as well as dozens of other physicians who worked for the medical group Darrigan oversaw.

24.    The remaining facts will be set for the hereinbelow.

## II.    PARTIES

25.    David Soria, Plaintiff herein, is an individual whose resides in Deerfield Beach, Florida.

26.    David Darrigan, Plaintiff herein, is an individual who resides in Allen, Texas 75013.

27.    TP Holdco, LLC, Plaintiff herein, is a Florida limited liability company that has its principal place of business at 7188 NE 8TH Drive, Boca Raton, Florida 33487.

28.    True Partners Emergency Physicians, LLC, Plaintiff herein is a Florida limited liability company with offices in Texas and Florida.

29.    Emergency Specialists of Wellington LLC, Plaintiff herein, is a Florida limited liability company with its office located in Florida.

30.    TruePartners Westlake Emergency Specialists LLC, Plaintiff herein, is a Florida limited liability company with its offices in Florida.

31.    TruePartners Ranch Emergency Specialists LLC, Plaintiff herein, is a Florida limited liability company with its offices in Florida.

32.    TruePartners Manatee Emergency Specialists LLC, Plaintiff herein, is a Florida limited liability company with its offices in Florida.

33.    TruePartners Lakewood Inpatient Specialists LLC, Plaintiff herein, is a Florida limited liability company with its offices in Florida.

34.    Town Square Emergency Associates, PLLC, Plaintiff herein, is a Texas professional limited liability company with its offices located in Texas.

35.    TruePartners Northwest Emergency Associates, PLLC, Plaintiff herein, is a Texas professional limited liability company with its principal offices located in Texas.

36.    TEP Select Emergency Specialists, PLLC, Plaintiff herein, is a Texas professional limited liability company with its principal offices located in Texas.

37.    Texoma Emergency Physicians, PLLC, Plaintiff herein, is a Texas professional limited liability company with its principal offices located in Texas.

38.    TruePartners Comanche Emergency Specialists LLC, Plaintiff herein, is an Oklahoma limited liability company with its principal offices located in Oklahoma.

39.    Defendant APP Holdco, LLC is a Delaware limited liability company that can be served by serving its registered agent Cogency Global Inc., at 850 New Burton Road, Suite 201, Dover, Delaware 19904.

40.    Defendant John Rutledge is an individual who resides in Tennessee who has already been served.

41.    Defendant Tony Briningstool is an individual who resides in Tennessee who has already been served.

42.    Defendant Andy McQueen is an individual who resides in Tennessee who has already been served.

43.    Defendant CPV APP Blocker, Inc., a director and holder of 100% of the voting units of APP, LLC as well as a holder of over 95% of the voting units in APP's *other* director (APP Holdco,

LLC), is a Delaware corporation that can be served by serving its registered agent, Cogency Global Inc. at 850 New Burton Road, Suite 201, Dover, Delaware 19904. CPV APP Blocker, Inc.'s president is Bradley M. Langer, who is also Managing Director at Brown Brothers Harriman & Co.

44.     Defendant Brown Brothers Harriman Capital Partners V, LLC is a New York limited liability company that can be served by serving its registered agent, Brown Brothers Harriman & Co., at Legal Secretary's Office, 140 Broadway, 4th Floor, New York, New York, 10005.

45.     Defendant Brown Brothers Harriman & Co. is a Delaware corporation that can be served by serving its General Counsel at 140 Broadway, New York, New York, 10005.

46.     Defendant Brown Brothers Harriman Capital Partners L.P. is the private equity arm of Brown Brothers Harriman Company and can be served by serving its registered agent at the Office of General Counsel, 140 Broadway, New York, New York, 10005.

47.     Defendant Brentwood Capital Partners, L.P. II is a Tennessee limited partnership that was a director in APP Holdco, LLC that can be served with process at its registered agent, Kevin L. Murphy whose office is located    at 5000 Meridian Blvd., Suite 350, Franklin, Tennessee 37067.

48.     Defendant Brentwood Equity Management, LLC is a Tennessee limited liability company that served as managing partner of Brentwood Capital Partners, L.P. II, who may be served by serving its registered agent, Thomas C. Wylly II, at 1600 West End Avenue, Suite 150, Nashville, Tennessee 37203.

49.     Defendant Brentwood Capital Advisors, LLC is a Tennessee limited liability company that was a director for APP Holdco, LLC, which can be served by serving its registered agent Christopher Whitson at 150 3rd Avenue South, Suite 1100, Nashville, Tennessee 37201.

### III.   CHOICE OF LAW

53.    Texas law applies to Plaintiffs' corporate practice of medicine claims in Texas ("CPOM claims"). The application of Texas law on CPOM claims is constitutional, and Texas has a strong interest in regulating the business practices of resident corporations, deterring, and enjoining the commission of unlawful practices, and affording restitution to those harmed by activities occurring in and emanating from Texas.

54.    Texas is the state in which Defendants violated Texas' prohibition on the Corporate Practice of Medicine ("CPOM"), offered unlawful kickbacks in exchange for patient referrals, employed physicians, controlled staffing at physician's offices, controlled profits and revenues from physician offices, used illegal restrictive covenants in their contracts with physicians, maintained control over "paper professional corporations" to circumvent CPOM laws, but violating them instead, committed unfair business practices, including false advertising, and violated the CPOM applicable rules and regulations, relating to fee-splitting, kickbacks, or other similar practices by physicians and surgeons or psychologists.

55.    All Plaintiffs were injured by conduct occurring in and emanating from Texas because the Defendants directed that all Plaintiffs' takings from the sale of the Plaintiffs' contracts in Texas, Oklahoma, and Florida be transferred to TP Holdco, LLC, a Florida limited liability company.

56.    Defendants have significant minimum contacts with Texas creating State interests with all parties and the alleged acts. Texas' interests far exceed those of any other state.

57.    Texas law also applies to the Plaintiffs' Texas Blue Sky Law claims because these claims are based on Texas statutes. The application of Texas law on CPOM claims is constitutional, and Texas has a strong interest in regulating the business practices of resident corporations, deterring,

and enjoining the commission of unlawful practices, and affording restitution to those harmed by activities occurring in and emanating from Texas.

58.     Florida Law applies to the Plaintiffs' Florida Blue Sky Law claims, and Delaware law applies to the Plaintiffs' Delaware Securities Act claims for the same reasons.

59.     Delaware law applies to the Plaintiffs' claims against the Contracting Defendants, as well as their private equity principal Defendants for breach of duty of loyalty and good    faith, breach of the implied covenant of good faith and fair dealing, aiding and abetting the breaches of these duties, and fraudulent inducement.

## IV.    PIERCING THE CORPORATE AND LLC VEILS

60.     APP Holdco, LLC and CPV APP Blocker, LLC (APP's two members) were completely owned and operated by two private equity and investment groups that retained voting control: Brown Brothers Harriman & Co., and Brentwood Capital Advisors. The entire (massive) APP project was a cut-and-paste of other private equity firm plays to roll up large medical staffing companies into a single massive company in the last decade.

### A. Brown Brothers Harriman

61.     Brown Brothers Harriman ("BBH") controlled 95% of APP's voting units through its ownership of Sponsor Units in APP Holdco, LLC through CPV APP Blocker, LLC.

62.     There were only two members of the shell company American Physicians Partners, LLC (hereinafter "APP"): APP Holdco, LLC and CPV APP Blocker, LLC. CPV APP Blocker, LLC (owned by Brown Brothers Harriman's private equity arm: Brown Brothers Harriman Capital Partners, L.P.) held all    the preferred voting units of APP, while APP Holdco, LLC held all    the common units in APP.

14

63.     CPV APP Blocker, LLC was the blocker company and agent for Brown Brothers Harriman Capital Partners V, LLC, which was the agent of Brown Brothers Harriman Capital Partners, L.P., which was the private equity arm of Brown Brothers Harriman Co., and Brown Brothers Harriman & Co.

64.     CPV APP Blocker, LLC was also the sole voting member of APP, and was the holder of 95% of the voting units in APP's other director, APP Holdco, LLC. Therefore, through its agent CPV APP Blocker, LLC, Brown Brothers Harriman Capital Partners V, LLC, was solely in control of both of APP's voting members (CPV APP Blocker, LLC and APP Holdco, LLC).



65.     CPV APP Blocker, LLC had no funds or assets on its books, nor any revenue received pursuant to the APP Holdco, LLC Operating Agreement or the APP Operating Agreement. These payments were transferred immediately to its principal: Brown Brothers Harriman Capital Partners V, LLC, which, in turn, immediately transferred those funds to *its* principal: Brown Brothers Harriman Capital Advisors, L.P. The profit was then transferred to Brown Brothers Harriman & Co. All    the funds needed for these    BBH Defendants to operate and direct APP Holdco, LLC and APP were funded by Brown Brothers Harriman & Co. through its agent Defendants BBH Capital Advisors, L.P., BBH Capital Partners, L.P., to CPV APP Blocker, LLC. This was meant to insulate Brown Brothers Harriman & Co. from lawsuits or tax debts that may arise from its

operation and direction of APP and APP Holdco, LLC, through its Brown Brothers Harriman Capital Partners V, LLC and CPV APP Blocker, LLC.

66.     All actions taken by CPV APP Blocker, LLC were directly controlled by Brown Brothers Harriman Capital Advisors, L.P. through its agent Brown Brothers Harriman Partners V, LLC, both of which were completely owned and operated by Brown Brothers Harriman & Co.

67.     CPV APP Blocker, LLC was never adequately capitalized for the undertaking as it held no assets and no funds at the time of the transactions in this case. Indeed, CVP APP Blocker, LLC was insolvent at times during which it managed and directed the business of APP Holdco, LLC and APP. There is also no record of it ever observing corporate formalities. The dominant shareholder (Brown Brothers Harriman Capital Partners V, LLC) simply siphoned company funds from CPV APP Blocker, LLC as soon as it received them from the business of APP, including the exorbitant distributions paid to the BBH Defendants as the principal of the holder of all of the preferred units and non-participating preferred units in APP. CPV APP Blocker simply functioned as a façade for its sole, dominant shareholder, and that dominant shareholder's principals.

68.     To disregard the principal BBH Defendants in this case, even though they controlled all of APP's business, along with all of APP's countless affiliates in seventeen states, will create an overall element of injustice or unfairness. BBH was directing every action taken by CPV APP Blocker, LLC including its decisions to violate the corporate practice of medicine doctrine in Texas and Oklahoma, drafting the forms of the Purchase Agreement and its transactional documents, and targeting Plaintiffs through Rutledge,     McQueen and Briningstool for rolling up into the APP brand.

### B.  Brentwood Capital

69.     Defendant Brentwood Capital Partners, L.P. II is a Tennessee limited partnership that was a director in APP Holdco, LLC. Brentwood Capital Partners, L.P. II was completely owned and controlled by Defendant Brentwood Equity Management, LLC, which was completely owned and controlled by Brentwood Capital Advisors, LLC.

70.     Brentwood Capital Advisors, LLC organized and approved the initial purchase of APP by Brown Brother Harriman in 2015. It also approved the form of the Purchase Agreement in issue in this case (as well as all the other medical groups that were rolled up by APP under the control of BBH). Between 2015 and 2016, Brentwood Capital Advisors, LLC created Brentwood Equity Management, LLC, and Brentwood Capital Partners, L.P. II for the purpose of owning units in APP Holdco, LLC in the same manner as Brown Brothers Harriman and Blackstone created their agents and sub-agents.

71.     Brentwood Capital Partners, L.P. II had no funds or assets on its books, nor any revenue received pursuant to the APP Holdco, LLC Operating Agreement. These payments were transferred immediately to its principal: Brentwood Equity Management, LLC, which, in turn, immediately transferred those funds to *its* principal: Brentwood Capital Advisors, LLC.    All the funds needed for these Brentwood Defendants to operate and direct APP Holdco, LLC and APP were paid by their principal, Brentwood Capital Advisors, LLC. This was meant to insulate Brentwood Capital Advisors, LLC from any lawsuits or tax debts that may arise from its operation and direction of APP and APP Holdco, LLC, through its agent, Brentwood Capital Partners, L.P. II.

72.     Brentwood Capital Partners, L.P. II was never adequately capitalized for the undertaking as it held no assets and no funds at the time of the transactions in this case. Indeed, Brentwood Capital Partners, L.P. II was also insolvent at times during which it managed and directed the

business of APP Holdco, LLC and APP. There is also no record of it ever observing corporate formalities. The dominant shareholder (Brentwood Equity Management, LLC and Brentwood Capital Advisors, LLC) simply siphoned company funds from Brentwood Capital Partners, L.P. II as soon as it received them from the business of APP, including the exorbitant distributions paid to the Brentwood Defendants as the holder of many of the voting units in APP Holdco, LLC. Brentwood Capital Partners, L.P. II simply functioned as a façade for its sole, dominant shareholder.

73.     To disregard the principal Brentwood Defendants in this case, even though they assisted in controlling APP Holdco, LLC and APP's business, overseeing and approving each of the documents used to purchase the Plaintiff Companies, and also directing Rutledge, McQueen, and Briningstool to misrepresent APP Holdco, LLC's financials to the Physician Plaintiffs, along with all of APP's countless affiliates in seventeen states,     would create an overall element of injustice or unfairness.

### C. Private Equity Shell Companies

74.     Each of the private equity Defendants' shell or agent companies are completely expendable by their Private Equity Firm owners in cases of litigation. None of them own any assets or funds or have their own employees.  The two Private Equity Firm Defendants create new LLCs and new L.P.s every time they invest in a new project, separating the by Roman numerals or additional of letters. In this case, a Director of Brown Brothers Harriman Capital, L.P. actually signed the APP Holdco, LLC operating agreement on behalf of its agent CPV APP Blocker, LLC, which is several alter ego companies away from BBH. Brentwood Capital Advisors, LLC's manager also signed the APP Holdco, LLC operating agreement on behalf of Brentwood Capital Partners, L.P. II as well.

75.     It would create an injustice, and prejudice to the Plaintiffs, if these expendable companies are found not to be alter egos of the Private Equity Firms that invest and take distributions through them. A judgment against any of the Sponsor Unit Holders would end in another bankruptcy where the company has no assets, while a finding that they are not alter egos would result in the Private Equity Firm Owners being able to continue to do what they did in this case.

76.     To be sure, Brown Brothers Harriman Capital Advisors, L.P. has continued to roll up healthcare related companies, only these days they are focusing on nursing companies like GIFTED Healthcare to avoid the CPOM problems that arose in this case. And through new subsidiaries like Brown Brothers Harriman Capital Partners VI, L.P. and CP VI, LLC, names that were next on their expendable list, according to number.

## V.    AGENCY

77.     At all times complained of, and since 2015, APP Holdco, LLC, and its partner CPV APP Blocker, LLC have been under the complete control of their private equity and investment owners, Blackstone, Brown Brothers Harriman, and Brentwood Capital Advisors, LLC, through agents and sub-agents of each, their similarly named Defendants.

78.     Brown Brothers Harriman Co. and/or Brown Brothers Harriman & Co., both exercised control over the actions of Brown Brothers Harriman Capital Partners, LLC, which, in turn, operated strict control over Brown Brothers Harriman Capital Partners V, LLC, which in turn operated strict control over CPV APP Blocker, LLC, which, on paper only, controlled 100% of the common units in APP.

79.     Brown Brothers Harriman Co. and Brown Brothers Harriman & Co., both exercised control over the actions of Brown Brothers Harriman Capital Partners, LLC and Brown Brothers Harriman

Capital Partners V, LLC, which, in turn owned 63,764,006 voting shares in APP Holdco, LLC (which is over 95% of the control over APP Holdco, LLC).

80.    Defendant Brentwood Capital Partners, L.P. II, another unit holder in APP Holdco, LLC, was completely owned and controlled by Defendant Brentwood Equity Management, LLC, which was, in turn, completely owned and controlled by Brentwood Capital Advisors, LLC.

81.    Each of the Defendants above controlled the manner in which Rutledge, McQueen, and Briningstool misrepresented the financials of APP Holdco, LLC, and the manner in which they targeted Plaintiff Companies for roll-up into a system that violated nearly every    CPOM law in Texas and Oklahoma.

## VI.    FACTS

### A. APP's History

82.    In 2015, American Physician Partners, LLC raised $25 million from Goldman Sachs Specialty Lending Group. Brentwood Capital Advisers, LLC acted as financial advisor. APP then acquired emergency room staffing firms Align MD and Elite Management Services for $24 million. After the purchase, American Physician Partners served 23 hospitals in six states, and planned to expand in the Southeast and Southwest.

83.    In 2016, APP sold 50% of its equity units to Brown Brothers Harriman using BBH's agent and sub-agents Brown Brothers Harriman Capital Partners, Brown Brothers Harriman Capital Partners V, LLC and CPV APP Blocker, Inc. Each company was an agent and sub-agent of the other Brown Brothers Harriman Defendants. Brentwood Capital Partners, L.P. II co-invested in APP's other member APP Holdco, LLC as well, and served as financial advisors for APP in the deal.

84.    Each time APP Holdco, LLC purchased an ER staffing company, or a medical group of affiliated staffing companies, it did so immediately before transferring ownership of the medical groups or standalone ERs into "American Physician Holdings, LLC," a shell company APP Holdco, and CPV APP Blocker, LLC directed APP to form for holding title ownership of the ERs. Then, using dozens of newly formed "APP-named" subsidiary, formed in the states where the purchase was made, the physicians who worked in those ERs would be asked to sign new employment agreements with the new company. By 2023, American Physician Holdings, LLC (completely controlled by APP Holdco, LLC and CPV APP Blocker, LLC as the sole members of APP) owned over one-hundred subsidiary PLLCs and LLCs across seventeen states (Alabama, Arizona, Arkansas, Georgia, Illinois, Kansas, Kentucky, Louisiana, Michigan, Mississippi, New Mexico, Ohio, South Carolina, Tennessee, Texas, Virginia and West Virginia). The result was that APP Holdco, LLC and CPV APP Blocker, LLC contractually owned and operated (through their total control of APP subsidiary American Physician Holdings, LLC)    150 Emergency Rooms in those states. Those contracts were spread across more than 135 sites and involved more than 2,500 physicians.

85.    Defendants Briningstool, Rutledge and McQueen were each holders of "Investor Units" in APP Holdco, LLC, and personally approved all of the actions of the principals of the Unit Holders in APP Holdco, LLC: CPV APP Blocker, LLC (BBH agent), and Brentwood Capital Partners, L.P. II (Brentwood Capital Advisors, LLC agent).

86.    There were at least fifty subsidiary "PLLCs" created by American Physician Holdings, LLC that were created to circumvent the corporate practice of medicine laws in each state    by using purportedly "physician owned" companies to hire doctors in EDs. However, most if not all of these newly formed affiliates were initially, solely operated by one doctor: Tony Briningstool.



87.    Indeed, Tony Briningstool was the **sole** doctor listed as owner of    over fifty Professional

Medical Limited Liability Companies that became the sole member of the ERs that APP Holdco,

LLC purchased from the Plaintiffs in Texas, Oklahoma and Florida. There is no question that a single doctor cannot oversee the patients and physicians at 250 EDs.

88.     But then it got worse. Regardless of the CPOM laws prohibiting any of these newly formed affiliates from being owned in any way by a non-physician, American Physician Holdings, LLC (under the direct direction and control of APP Holdco, LLC and CPV APP Blocker, LLC) removed Defendant Briningstool from membership in all these entities, replacing him with Defendant McQueen (an attorney).

89.     *For at least five years, an attorney has been the managing member or manager of over 75 companies that were purportedly overseeing 250 emergency rooms in seventeen state*s.

### B. APP Violated CPOM Laws Purchasing Soria and Darrigan's Medical Group

93.     In January of 2019, Defendant Rutledge contacted Soria about buying all his emergency room contracts in exchange for cash and equity in APP Holdco, LLC. In February 2019, Soria retained Nexxus Healthcare Brokers to represent him in the sale of his shares in his companies. In April 2019, Soria met John Rutledge at the home of Soria's broker, Bill Lautman, in Miami, Florida.

94.     On or about August 15, 2019, John Rutledge, Tony Briningstool, and Andy McQueen (under the direction of CPV App Blocker, LLC., Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman Co., Brown Brothers Harriman & Co., Brown Brothers Harriman Capital Partners, L.P., Brentwood Capital Partners, L.P. II, Brentwood Capital Advisors, LLC, Brentwood Equity Management, LLC, & Blackstone Capital Partners, L.P.), agreed to overstate the value of the APP Holdco, LLC to induce Soria to give control of his companies to them. They agreed to falsely represent to Soria: i) that the value of the shares of APP Holdco, LLC were $4.50 per share (when in reality the value of those shares was less than zero); ii) that the APP

family of companies had a low debt-to-equity ratio; iii) that the APP family of companies was solvent; and iv) that APP Holdco, LLC and American Physician Holdings, LLC would post a profit in 2019. In reality, Brown Brothers Harriman (in conspiracy with the other Defendants) were buying all of the emergency room staffing companies they could buy through APP Holdco, LLC, placing all the debt from the purchases on the books of APP Holdco, LLC, and then transferring title ownership to American Physician Holdings, LLC which passed the value of those assets through to APP. Instead of a profit like the Defendants promised, APP Holdco, LLC posted a net income loss of $147.6 million in 2019. That was followed by net income losses of $131.6 million and $114.6 million in 2020 and 2021.

95.    On or about August 25, 2019, in agreement and conspiracy with Andy McQueen, CPV App Blocker, LLC., Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman Co., Brown Brothers Harriman & Co., Brown Brothers Harriman Capital Partners, L.P., Brentwood Capital Partners, L.P. II, Brentwood Capital Advisors, LLC, Brentwood Equity Management, LLC, & Blackstone Capital Partners, L.P., Defendants Briningstool and Defendant Rutledge met with Soria and nineteen other emergency room directors of the above-mentioned eleven companies (including Plaintiff Darrigan) at the Grand Hyatt Dallas Fort Worth International Airport located at 2337 S International Pkwy, Dallas, Texas 75261.

96.    During that meeting, Defendant Briningstool and Rutledge misrepresented APP Holdco's financial position, and its future outlook, to induce the sale of Soria's companies. Defendant Rutledge and Briningstool, in conspiracy with Andy McQueen, CPV App Blocker, LLC., Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman Co., Brown Brothers Harriman & Co., Brown Brothers Harriman Capital Partners, L.P., Brentwood Capital Partners, L.P. II, Brentwood Capital Advisors, LLC, and Brentwood Equity Management, LLC, told Soria

and Darrigan that the shares of APP Holdco, LLC were valued at $4.50 per share, that APP was profitable and solvent, and that each of the eleven companies would continue to grow because the APP companies would fully support them and continue to increase their ability to provide healthcare services to the public. They also represented to Soria and Darrigan that the CPV ("Cash Per Visit") for each patient in each of the emergency rooms APP purchased was higher than the amount than they were actually earning.

97.     Rutledge and Briningstool, in conspiracy with Andy McQueen, CPV App Blocker, LLC., Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman Co., Brown Brothers Harriman & Co., Brown Brothers Harriman Capital Partners, L.P., Brentwood Capital Partners, L.P. II, Brentwood Capital Advisors, LLC, and Brentwood Equity Management, LLC offered Soria 6.5 million shares of APP Holdco, LLC allegedly worth $4.50 per share for a total amount of Twenty-Nine Million Two-Hundred Fifty Thousand Dollars & No Cents ($29,250,000.00) in equity, plus cash, in exchange for his transfer of ownership of his shares in his companies into their control and use in conspiracy with Defendants. On that same day, John Rutledge and Tony Briningstool, pursuant to their conspiracy with the Defendants, told the approximately nineteen emergency room directors present that they could continue working as usual after the purchase and sale close. They also offered Plaintiff Darrigan 62,500 shares for his continued work for one of the companies Soria sold, should he agree to continue working for APP, totaling Darrigan's expected income of $280,250.00.

98.     Plaintiff Soria sold all of the following to APP Holdco, LLC on October 25, 2019: (i) True Partners Emergency Physicians, LLC, a Florida limited liability company, (ii) Emergency Specialists of Wellington LLC, a Florida limited liability company, (iii) TruePartners Westlake Emergency Specialists LLC, a Florida limited liability company, (iv) TruePartners Ranch

Emergency Specialists LLC, a Florida limited liability company, (v) TruePartners Manatee Emergency Specialists LLC, a Florida limited liability company, (vi) TruePartners Lakewood Inpatient Specialists LLC, a Florida limited liability company, (vii) Town Square Emergency Associates, PLLC, a Texas professional limited liability company, (viii) TruePartners Northwest Emergency Associates, PLLC, a Texas professional limited liability company, (ix) TEP Select Emergency Specialists, PLLC, a Texas professional limited liability company, (x) Texoma Emergency Physicians, PLLC, a Texas professional limited liability company, and (xi) TruePartners Comanche Emergency Specialists LLC, an Oklahoma limited liability company. Several others were added to the Soria/Darrigan medical group after October 2019 as set forth above in the introduction.

99.    About a year after the sale, all of the Plaintiffs learned the Warranty Section (Section VI) of the Purchase Agreement included several untrue statements in the form of warranties, as set forth above in the Introduction. In those untrue warranties, APP Holdco, LLC and American Physician Holdings, LLC promised that they were solvent, and that they were in compliance with all Healthcare Laws. They promised they were not in violation of the CPOM laws as well.

100.    APP Holdco, LLC and American Physician Holdings, LLC acknowledged their awareness of CPOM laws on page two of Schedule 2(i) to the Purchase Agreement:

"***Many states prohibit business entities from owning or controlling medical practices.***

The laws in many of the states in which we operate or into which our operations may expand, prohibit business entities from practicing medicine and from exercising control over or employing physicians who practice medicine. This corporate practice of medicine prohibition is intended to prevent unlicensed persons from interfering with or inappropriately influencing the physician's professional judgment. These and other laws may also prevent fee-splitting, which is the sharing of professional service income with non-professionals. The interpretation and enforcement of these laws vary significantly from state to state. There is a risk that state regulatory authorities or courts may find that our relationships with our affiliated physicians violate the applicable state's corporate practice of medicine and fee-splitting prohibitions. In addition, regulatory authorities or

26

courts could determine that we have not complied with new laws which may be enacted, rendering our arrangements illegal. If any of these events occur, the Company may be subject to fines and penalties, and changes in our business model may be required, all of which may have a material adverse effect on our business, financial condition and results of operations."

101.     Without regard for the CPOM laws that the Defendants were well-aware of, APP Holdco, LLC purchased Soria's companies (even though it was owned and controlled by Rutledge, Briningstool, McQueen, BBH, Brentwood and Capital, and their agents and sub-agents) while one of its sub-subsidiaries, APP Management Co, LLC, hired Soria to continue running the companies he sold (even though      APP Management Co, LLC was not owned or operated by a physician). As such, APP Holdco, LLC and American Physician Holdings, LLC were immediately in breach of the contract.

102.     But it was not just these two companies that planned this purchase and drafted this contract. The form of the contract was regularly used by Brown Brothers Harriman Co, and Brown Brothers Harriman & Co.'s agent, Brown Brothers Harriman Capital Partners, and their agent Brothers Harriman Capital Partners V, LLC, sole shareholder and principal of CPV APP Blocker, LLC. It was also agreed upon for use in this sale by the private investment firm Brentwood Capital Partners, L.P. II, whose controlling principal is Brentwood Equity Management, LLC which is, in turn, completely controlled by Brentwood Capital Advisors, LLC. Each of these Defendants conspired amongst themselves and with APP Holdco, LLC, American Physician Holdings, APP, and CPV APP Blocker, LLC to knowingly circumvent CPOM laws in Texas and Oklahoma by hiding the actual corporate structure of APP, and by using a Florida LLC as the signatory for Plaintiffs on the subscription agreement[3].

---

[3] Florida has lax CPOM laws.

103.    Another of APP's subsidiaries, APPTexas ED, PLLC, hired Darrigan. APPTexas ED, PLLC was solely owned and operated by Andrew McQueen, an attorney, since 2020. Plaintiff Darrigan received monetary consideration from APPTexas ED, PLLC, in exchange for remaining medical director for the Texas companies APP Holdco, LLC purchased. This was another illegal act by APP Holdco, LLC and its sub-sub-subsidiary APPTexas ED, PLLC. Not to mention that APPTexas ED, PLLC was an illegal company because it was not owned by licensed individuals.

104.    After Plaintiffs' companies were purchased, APP Holdco, LLC and CPV APP, Blocker, LLC, under direction from their directors[4] and principals, using APP's subsidiaries, exercised strict control over the ERs, financially and operationally. Although Soria and Darrigan were occasionally involved in some staffing decisions, APP Holdco, LLC, along with its investors John Rutledge, Andrew McQueen, and Tony Briningstool, and its private equity directors (BCP II, LLC, CPV APP Blocker, LLC and Brentwood Capital Partners L.P., II, and each of their private equity principals), made all the financial and operational decisions for the medical group Plaintiffs.  David Darrigan, Regional Medical Director over the medical companies purchased and added after the purchase, made efforts to maintain certain operational standards that he knew were important to run an efficient and quality Emergency Department, but the Defendants and their principals made money saving staffing changes, and procedural changes that effected patient care, in violation of    CPOM laws.

105.    In fact, the Defendants, in conspiracy with one another, directed their subsidiaries to make sweeping changes to every aspect of the medical groups APP Holdco, LLC purchased. The changes included:

---

[4] CPV Blocker APP, Inc., (individually and as the agent for Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman Co., L.P., Brown Brothers Harriman & Co. L.P., Brown Brothers Harriman Capital Partners, L.P), Brentwood Capital Partners, L.P. II (individually and as agent for Brentwood Equity Management, LLC), Brentwood Capital Advisors, LLC, John Rutledge, Tony Briningstool, and Andy McQueen.

- Scheduling. Defendants determined the physicians' schedules and the scheduling system forcing physicians to work under Defendants' scheduling guidelines, regardless of physician complaints that it would negatively affect patient outcomes.

- Physician Pay. Payment to the physicians was controlled by the Defendants. Defendants collected the payments and subsidies from the individual hospitals where the companies were based, then Defendants decided how much to pay to the Physicians, when they were paid, and in what manner they were paid, resulting in physician resignations, which directly negatively impacted patient care.

- Patient Hospital Admissions. Defendants determined a quota for the number of out-patients that must be admitted into the hospitals as an in-patient so that Defendants would not lose subsidy payments from the hospitals, whether the patients needed to be admitted or not.

- Malpractice insurance. The Defendants took control of the malpractice insurance over the physicians, determining physician coverages, and cancelling "tail" policies. This was a breach of the contract.

- Revenue.  When there was positive revenue from a specific ED, Defendants took that revenue, and they kept the profits. It was no longer distributed to the physicians. This is prohibited under CPOM laws.

- Hospital Contracts. Defendants took over contract negotiations, renewals, and cancellations with hospitals.

- Staffing Ratios. Defendants took over control how many doctor and midlevel coverage/hours each ER would be allowed to have, to encourage "private equity efficiencies" at the cost of patient care.

- Provider Contracts. Defendants took control of the contents of physician employment agreements, including the addition of harsh non-competes which are barred under CPOM laws.

- Billing and Coding. Defendants took control over the billing and coding from the physicians. Defendants switched their billing company to an affiliate of Defendants, severely damaging the profitability the ERs.

- Management of ERs. All practice management policies and any other aspect of the business was ultimately under Defendants' control. Physicians were forced to take their recommendations for patient care to the Defendants, who would normally return a rejection of the physician recommendation for necessities due to cost and "private equity efficiencies."

- Emergency Room Hours. Defendants determined what number of hours of coverage would be provided per day in the Emergency rooms.

- <u>Physician Rates</u>. Defendants determined in their sole discretion how much Physicians and Physician Assistants could charge as their hourly rate.

- <u>Medical Directors</u>. Defendants determined how much a medical director for the ERs could be paid.

- <u>Patient Quotas</u>. Defendants set the quota for how many patients per hour should be seen.

- <u>Satisfaction Quotas</u>. Defendants set the floor for patient satisfaction scores which affected physician pay.

106.    During 2020, 2021, 2022, and 2023, Rutledge, Tony Briningstool, and Andy McQueen, in conspiracy with the rest of the Defendants, understaffed all of Soria's former companies, as well as hundreds of other emergency rooms across the United States, further hurting the equity in APP Holdco, LLC.

107.    As far as taking money from hospitals, the Defendants, in agreement and in conspiracy amongst themselves and their agents and sub-agents and alter egos, took 100% of the money the hospitals previously paid directly to the medical group, then paid the ER providers monthly from what was received, simultaneously with Defendants' determination of how many hours the physicians could work, and what rate they could earn per hour. In short, the non-physician Defendants completely controlled how much money the physician made for their work in violation of    CPOM laws.

108.    It is also important to note that Defendants required Soria and Darrigan to sign non-competes.

### C.  Defendants' Corporate Structure Violated CPOM

109.    At its height, Defendants, through their subsidiaries, agents, and at the direction of their Defendant Private Equity Principals, operated all of Plaintiffs' Emergency Departments

throughout Texas, Oklahoma, and Florida, although its head of operations for these states were in Brentwood, Tennessee.

110.   At all times, APPTexas ED, PLLC (Darrigan's employer) was a Tennessee Professional Limited Liability Company doing business in Texas. Its sole member was APP Emergency ED TX, Inc., a nonprofit corporation, which is prohibited under Texas law because the corporation was not owned and controlled by a professionally licensed person. Neither entity had any doctors listed in their public information reports after 2020.

111.   At all times complained of, APP Texas, PLLC was a Texas Professional Limited Liability Company which was also owned by APP Emergency ED TX, Inc., in violation of CPOM laws, and the Texas laws on ownership in a PLLC. In Texas and most other states, PLLCs cannot be owned by anyone other than a licensed professional.

112.   At all times complained of, APP Management Co., LLC was owned by its sole member, American Physician Holdings, LLC. APP Management Co., LLC, a Delaware limited liability company,    agent and alter ego of American Physician Holdings, LLC, employed Plaintiff Soria in violation of CPOM laws while he was overseeing Texas and Oklahoma ERs.

113.   Further, each of the above subsidiaries were owned by American Physician Holdings, LLC, which was owed and controlled by American Physician Partners, LLC, which was owned and controlled by APP Holdco, LLC, Brown Brothers Harriman, Blackstone, and Brentwood Capital Advisors' shell companies, agents and sub-agents and alter egos, and by CPV APP Blocker, LLC, Brown Brothers Harriman's shell company agent and alter ego.

114.   American Physician Partners, LLC, APP Holdco, LLC, and American Physician Holdings, LLC are alter-egos of each other, having common ownership and no separate corporate identities, and/or are agents of one another.

31

115.    Each of the Defendants, in agreement and conspiracy amongst themselves (and others now in bankruptcy) violated the Medical Practice Act, including Texas Occupations Code §§155.001, 155.003, 157.001, 162.051, 162.053, 164.052(a)(8), (13), and 165.156., Chapter 848, Insurance Code, 22 Texas Administrative Code §177.17, 22 TAC §177.5, *et seq*., and the Anti-Kickback Statute (AKS) and False Claims Act (FCA).

116.    Texas, Oklahoma, (and many other states), bar lay entities from owning physician practice groups, employing physicians, or violating the Corporate Practice of Medicine Bar. Defendants' entire business model was to knowingly circumvent the ban of CPOM by purchasing, controlling, or creating over one hundred separate shell subsidiary Professional Limited Liability Companies, and non-profit corporations. Those subsidiary entities were controlled ultimately by APP Holdco, LLC, and CPV APP Blocker, LLC, along with the agreements, directions, and sponsorship of John Rutledge, Tony Briningstool, Andy McQueen, American Physician Partners, LLC, American Physician Holdings, LLC, Brown Brothers Harriman Capital Partners V, LLC, Brown Brothers Harriman, Co., Brown Brothers Harriman & Co., Brentwood Capital, LLC, Brentwood Capital Advisors, L.P.,  Brentwood Capital Advisors, LLC, and Brentwood Equity Management, LLC. The subsidiary APP-named PLLCs and LLCs existed only on paper to undertake functions the law permits only physicians to undertake, such as employing physicians or providing medical coverage for hospitals. The Texas Corporate Practice of Medicine Doctrine specifically bars the creation of professional corporations for such purposes and specifically prohibits the transfer of stock ownership in professional corporations to unlicensed "persons'" entities, such as the shell corporations APP created to exert control directly or indirectly over its     wholly owned physician groups.

117.    Defendants, individually and by their sponsors, investors and principals (BBH, and Brentwood) formed all these companies to evade Corporate Practice of Medicine and anti-kickback rules as shown above.

118.    The small, paper companies existed in all the states in which Defendants operated that have CPOM prohibitions. BBH, and Brentwood, along with their agents and sub-agents, and investors such as Rutledge, Briningstool and McQueen, managed, operated, and controlled these Professional Limited Liability Companies through their control of APP's Board of Directors (APP Holdco and CPV APP Blocker), and through APP's employees, officers, or agents.

119.    The shell PLLCs, LLCs, and nonprofit corporations, including those that owned the Company Plaintiffs, and those that employed the Doctor Plaintiffs, had operating agreements that limited the rights of their shareholders in favor of the Defendants as controllers of APP Holdco, LLC and CPV APP Blocker, and their appointed directors, sponsors, investors and principals. The members of the fake PLLCs and companies were also obligated to execute Agreements that include restrictions on their ability to issue dividends, create additional shares, or sell the PLLC without permission from Defendants.

120.    Indeed, Defendant's non-physician officers (McQueen and Rutledge) executed most of the exclusive services agreements with the Hospitals, not the physician shareholders of the PLLCs created to do those tasks.

121.    Defendants controlled all these paper PLLCs and companies in all material regards. They are a mere front through which Defendants carried out their private equity "efficiencies" and have no separate identity    from APP or its Board of Directors, or their Sponsors, except in form.

122.    Defendants, in agreement with one another, possess the direct and indirect power to direct or cause the direction of the management and policies of the affiliates and their ERs and physicians.

They chose and appointed the medical directors of the physician entities. Their use of professional corporations as described herein to circumvent CPOM laws is well known amongst private equity firms.

123.    APPTexasED, PLLC, is another such affiliate controlled by the Contracting Defendants under direction from their principals, their agents and sub-agents and alter egos, and managed by Defendant Briningstool. Dr. Briningstool, defendant herein, was APP's Senior Vice President and sole shareholder of      nearly all      APP shell companies, including APPTexasED, PLLC. APPTEXASED, PLLC, had its mailing address and principle executive offices located at APP's corporate headquarters in Brentwood, Tennessee.

124.    APPTexas HM, PLLC, a professional limited liability company, is another APP-controlled affiliate. Briningstool was also its president and sole shareholder. APPTEXAS HM's mailing address and principal executive offices are also located at APP's corporate headquarters in Brentwood, Tennessee.

125.    The list of companies Defendant Briningstool was the sole member of includes nearly all the companies shown in the chart above.

126.    To make matters worse, none of the corporate officers of any of APP's Texas or Oklahoma subsidiary affiliates were physicians licensed to practice medicine in Texas, Oklahoma, or any other state *after 2020*. All those APP affiliates' shares were transferred to Defendant McQueen or another non-licensed professional after their initial formation, none of which were medical doctors.

127.    Defendants, through the actions of its managers and directors and subsidiaries, and with their control over APP, had complete control over the professional medical corporations, nonprofit corporations, and professional limited liability companies it established and maintained. For five years, there were approximately two hundred and fifty medical practices nationwide representing

over twenty-five hundred physicians' practices in seventeen states, <u>owned by companies without a doctor at the helm</u>.

**D. Laws Barring the Corporate Practice of Medicine Are Protection Against Patient Harm.**

128.    American Physician Partners[5] either formed     the Medical Groups referred to above or installed      American Physician Partners executives or officers in pre-existing Professional Medical Companies to exempt itself from rules restricting Corporations from employing doctors, engaging in the practice of medicine, and preventing kickbacks. It either installed      straw-man owners or its executives as owners and corporate officers of each Professional Medical Corporation (referred to variously herein as controlled affiliate medical group, or medical groups or groups). Such owners      were bound by side agreements to sell the entities to American Physician Partners if requested for nominal amounts. The bylaws of such group or other agreements and practices prevented the removal of American Physician Partners Corporate officers or straw men. Plaintiffs are      informed and believes American Physician Partners' directors and managers and their principals further ensured corporate control of these professional controlled affiliate groups by requiring the physician members or owners to execute agreements limiting their authority. Such separate agreements include restrictions on the ability of the named physician owner and or members to issue dividends, create additional stock, sell the medical group, or transfer their shares.

129.    American Physician Partners' directors and managers and their principals required the affiliate professional medical corporation to cause either its executive or the straw-man owner to enter into a Management Services Agreement with American Physician Holdings, LLC's alter ego

---

[5] All references to APP refer also to its directors, managers, sponsors and their principals.

shell companies. American Physician Holdings, LLC's alter ego shell companies denominated their Management Services Agreements and Employment Agreements to mimic a traditional legitimate relationship whereby physicians independently choose a management services organization (MSO). The irony is that the physicians do not hire the MSO to work for them, but, rather, the physicians work for the MSO, any of a number of APP Holdco, LLC and CPV APP Blocker, LLC's shell companies, as set forth herein.

130.    After the Management Services Agreement    was entered into by the straw-man owner or leader of the affiliated Medical Group, or installed by APP's executive on behalf of the completely controlled group, the Directors and Managers of APP exercised profound and pervasive direct and indirect control and/or influence over the medical practice, making decisions     bearing directly and indirectly on the practice of medicine, rendering physicians as mere employees, and diminishing physician independence and freedom from commercial interests, in violation of Texas and Oklahoma's corporate practice of medicine ban.

131.    The directors and managers of APP decided how many and which physicians to hire, their compensation, and their work schedule. They also controlled and influenced advertising for physician vacancies, vetting physicians, establishing the terms of employment, the physician    s' rates of pay, scheduling the hours physicians    would work,     the staffing levels, the number of patient encounters, and working conditions. The directors and managers of APP decided when to terminate physicians and denied them rights to appeal via traditional medical staffing mechanisms. The directors and managers of APP negotiated the Groups' contracts with third-party payors and health insurers and then decided whether the group will agree to the terms. The Medical Group was bound to the terms of such agreement. Physicians    were not made aware of the terms of their

contracts with third-party payors. Physicians    had no rights under their employment agreements to make these decisions.

132.    The directors and managers of APP required physicians to assign their rights to the proceeds of their medical billings to American Physician Partners who then determined what    was charged to patients and insurers. American Physician Partners controlled coding decisions (how medical procedures are categorized for billing purposes), and billed patients and insurers for such medical services. Physicians employed by American Physician Partners' shell companies    did not see what    was billed and remitted in their names.

133.    The directors and managers of APP collected physicians' fees but did not report how much they collected in the physicians' names or the    Group's names. Physicians were not allowed to know what was billed in their name or the Group's    name because, in part, they would know how much profit    the directors and managers of APP were    making from their professional services.

134.    The directors and managers of APP created uniform contracts that physicians    had to sign as a condition of employment, which, inter alia, contained restrictive covenants. The directors and managers of APP determined each physician and group's    income as well as its own profits. They kept all revenue after payment of physicians' salaries, such that the relationship amounted to fee-splitting.

135.    Plaintiffs are    informed and believe    that the directors and managers of APP retained amounts from the physicians' billings that exceeded the reasonable value of the billing and any other administrative services American Physician Partners provided. Therefore, the directors and managers of American Physician Partners, and its shell companies, were participating in what amounts to illegal fee sharing with a lay entity. Further, because the Company Plaintiffs provided

services for which payment may be made in whole or in part under The Texas Health and Human Services Commission (HHSC), the Texas Healthcare Transformation and Quality Improvement Program, Waiver Payments to Hospitals for Uncompensated Care, payments under the Texas Government Code Reimbursements for Uncompensated Health Care Costs, Texas Health & Safety Code payments related to Medicaid, intergovernmental transfers to provide the nonfederal share of Medicaid payments for uncompensated care and other related payments to nonpublic hospitals, Local Provider Participation Funds, and Texas Reimbursements for Uncompensated Health Care, the Defendants took these state and federal subsidy payments as    their own. APP's certified public accountants who prepared and audited APP's financial statements treated those revenues as APP's income for accounting and tax purposes. Then the directors and managers of APP controlled the use of those funds collected in the physicians', and the medical companies', names.

136.    Given that APP installed the officers and directors of the completely controlled affiliate groups,    made all hiring and firing decisions, controlled    the financial aspects of the group, set salaries, controlled    contracting, and retained    any    profit—it    was the functional owner of the completely controlled affiliate groups irrespective of its use of the corporate form. APP so dominated and controlled the Professional Medical Corporations to the degree that    each corporation's independent existence was non-existent. American Physician Partners further established and promulgated physician "best practices," "red rules," and "evidence-based pathways" protocols which created standards for treating patients and    were used to compare the performance of physician to American Physician Partners-created or -endorsed standards, a form of clinical oversight. It created "benchmarking" reports that compared physician performance to American Physician Partners-created standards, intending to modify the exercise of their independent medical judgment. APP tracked physician performance and then provided "practice

improvement feedback" in the form of reports designed to educate physicians to practice medicine. APP represented to h ospitals that it improved operational deficiencies and management systems and would increase the efficiency of the health care delivery system. When delivered by American Physician Partners with its power and influence over hiring, firing, billing, contracting, salary, scheduling, work conditions, non-competes, and other aspects alleged herein, these performance standards have medical implications and violated the    CPOM doctrine.

137.    APP acknowledged in its contracts that: "    The laws in many of the states in which we operate or into which our operations may expand, prohibit business entities from practicing medicine and from exercising control over or employing physicians who practice medicine. This corporate practice of medicine prohibition is intended to prevent unlicensed persons from interfering with or inappropriately influencing the physician's professional judgment. These and other laws may also prevent fee-splitting, which is the sharing of professional service income with non-professionals. The interpretation and enforcement of these laws vary significantly from state to state. There is a risk that state regulatory authorities or courts may find that our relationships with our affiliated physicians violate the applicable state's corporate practice of medicine and fee-splitting prohibitions. In addition, regulatory authorities or courts could determine that we have not complied with new laws which may be enacted, rendering our arrangements illegal. If any of these events occur, the Company may be subject to fines and penalties, and changes in our business model may be required, all of which may have a material adverse effect on our business, financial condition and results of operations." The practices APP identified as subjecting it to risk in the 2019 purchase agreement existed in ever greater degree until APP filed bankruptcy for all    its shell companies. APP understood its practices to potentially be illegal and knowingly continued them.

138.    APP's agreements with the groups and control over them allowed it to increase billings to patients, insurers, and third-party payors for the physician services, which affected patient care. Ultimately, the Private Equity Defendants profit by reducing physician compensation, increasing the number of patients that physicians see per hour, and increasing the utilization of physician assistants to replace more costly physician coverage. For example, American Physician Partners told prospective hospital clients that physician assistants are two-thirds less costly than physicians and advocate increased use, although only physicians can make decisions related to patient care.

### E. CPOM and Anti-Trust Laws Prohibit Defendants Restrictive Covenants

139.    American Physician Partners required Soria and Darrigan to execute restrictive covenants that the physician may not attempt to assist or cause any other emergency medicine group medical practice to replace American Physician Partners. These provisions (set forth above) constitute further violations of the corporate practice of medicine.

140.    Plaintiffs are    informed and believe    that all    American Physician Partners' or its completely controlled affiliate groups' contracts with physicians have covenants that are as restrictive as Plaintiffs', if not more.

141.    By barring Soria and Darrigan from forming a group to compete with American Physician Partners' completely controlled affiliate groups or agreeing to work for any other medical group that    was soliciting or    would solicit the exclusive emergency services contracts held by American Physician Partners controlled groups, American Physician Partners, and its controlled affiliate groups restricted their ability to practice their profession. American Physician Partners further, unreasonably limited Soria's and Darrigan's employment options and ability to work for other groups for a critical period of 24 months, unreasonably interfered with their ability to compete with their former employer, American Physician Partners, all in violation CPOM laws.

142.    These contracts are null and void, and not enforceable. Many of the locations where American Physician Partners    held emergency department contracts in Texas and Oklahoma have a limited number of emergency departments in the locale and thus a limited number of employment opportunities for emergency department physicians.

143.    Even if Soria and Darrigan did not induce a hospital to terminate its contract with a controlled affiliate group and merely waited on the sidelines for that contract to expire or be terminated, they would still be restrained from practicing at contracting hospitals by virtue of the restrictive covenants in their employment agreements.

144.    Plaintiffs believe that American Physician Partners    ' disclosures to investors, prospective investors, stakeholders, and lending institutions since 2016 include admissions that these practices described above are in violation of state laws, but those communications are not public.

145.    Barring Plaintiffs from participating in unseating or competing for a contract that is controlled by American Physician Partners further violates public policy and is an incipient antitrust violation. It limited a hospital    's ability to choose the best emergency group and gave American Physician Partners an unfair and almost insurmountable advantage in retaining exclusive contracts in perpetuity. Hospital staff generally like working with the emergency department group they have known for years; an essential part of obtaining a new contract is a medical group    's promise to retain most emergency department physicians. However, the Plaintiff Physicians    ' mobility was restrained during the critical two-year    period, so that when Plaintiff Physicians departed from a group, they would be barred from competing for the contracts at those Hospitals where American Physician Partners operated.

146.    The provisions have the effect of substantially lessening competition and tending to create a monopoly in the business and trade of emergency department physician services throughout the

state of Texas, reducing the number of competitors for Emergency Services Contracts, limiting the supply of emergency physicians available to patients seeking emergency services, and causing increases in the price of such patient services by limiting the facilities where emergency physicians can practice in violation of Texas Free Enterprise and Antitrust Act; Tex. Bus. & Com. Code § 15.05; The Texas Constitution; Sherman Act; Clayton Act; and the Robinson-Patman Act.

147.    The non-competition provisions are unfair competitive practices under Texas, Oklahoma and Florida, and violate public policy. They interfere with a hospital's ability to obtain any physician group they determine could provide the best medical care, effectively preventing the Hospitals from retaining physicians currently working in the emergency department for two years.

148.    The non-competition provisions serve no legitimate proprietary interests. Emergency department contracts are not assets that may be legally bought or sold. To the extent American Physician Partners paid for the exclusive emergency department contract, as set for above, such conduct was illegal and did not confer a proprietary interest.

149.    Whether or not enforced by American Physician Partners, the inclusion of void non-competition provisions in the agreement wa    s    an unfair business practice.

### F. Defendants actively concealed their unlawful agreements and business practices.

150.    Defendants required all physicians to execute nondisclosure agreements concerning the contents of their employment agreements. They utilized multiple corporate entities to make it difficult to detect ownership and control of the medical groups and provisions and call their affiliates names other than American Physician Partners to avoid detection. For example, even though Plaintiffs' former companies would retain their contract for emergency physicians, the companies themselves would be in contract with an intermediary entity controlled by the Defendants.

### G. *Providing Kickbacks to Acquire Emergency Medicine Exclusive Contracts.*

151.    Except for narrowly specified exempt entities, hospital emergency departments in Texas are staffed by physician groups that work under agreements commonly known as exclusive emergency services contracts. Hospitals grant such contracts to a medical group to ensure continuous physician coverage of their emergency departments.

152.    The exclusive contracts are typically two or three years in duration. The physicians who receive the contract have the exclusive right to treat patients at the emergency department. Physicians who are not members of the group holding the exclusive contract are excluded from treating patients in such emergency departments unless hired as employees or independent contractors.

153.    Hospitals can generally choose among competing physician groups in awarding such exclusive contracts. Since exclusive emergency services contracts guarantee a continuous flow of patients, granting such a contract constitutes a referral of patients under Texas law.

154.    While    hospitals may pay subsidies to physicians for them to    enter exclusive hospital department staffing contracts, physicians may not offer consideration for receiving those staffing agreements because that would constitute compensation paid in exchange for a patient referral. American Physician Partners paid consideration in exchange for exclusive emergency room staffing contracts by paying hospitals in reduced subsidies.

155.    Plaintiffs are informed and believes this kickback scheme was one of    the standard methods of the Defendants in acquiring new contracts and maintaining existing ones.

156.    The directors and managers and principals of American Physician Partners offered or provided other considerations to acquire exclusive ER contracts, including offering other remuneration to physicians who controlled physician groups in exchange for them to induce

hospitals to transfer their Emergency Department contracts to Defendants' completely controlled affiliate groups. Plaintiffs are    informed and believes APP offered remuneration to acquire the contract at several hospitals identified herein.

### H.  Specific CPOM Laws Violated

157.    The practice of medicine in Texas is subject to extensive regulatory control    designed to protect the health and safety of the public. The Medical Practice Act, found in the Texas Occupations Code, amongst other Codes, prohibits corporations, lay entities, or any non-licensed persons or entities from practicing medicine, assisting in the unlicensed practice of medicine, directly or indirectly employing physicians, owning physician practices, and making business and administrative decisions that have medical implications. There are medical implications of business and administrative decisions relating to location of the practice, improvements, furnishings, inventory, design specifications, hiring and firing physicians and support staff, costs, gross billing, employee needs, and setting physician compensation. The Act prohibits the practice of medicine without a valid license, prohibits unlicensed persons from advertising or holding themselves out to the public as licensed, and prohibits conspiracies or aiding and abetting the unlicensed practice or sharing of fees. The primary objective of the Texas corporate practice of medicine doctrine is to push back against corporate pressures to ensure that physicians have space to exercise independent judgment in the best interests of the patient instead of the corporate bottom line.

158.    Section 155.001 of the Texas Occupations Code prohibits anyone from practicing medicine in Texas unless that person holds a license issued by the Texas Medical Board ("TMB").    Section 155.003 requires that a person must satisfy certain eligibility standards — including standards relating to age, professional character, and education — to obtain a medical license. Notably, the

requirements for a license to practice medicine are requirements that only an individual can meet; business entities would never be able to comply. Section 157.001 states that only Physicians may delegate to qualified people certain medical acts. Section 164.052 prohibits physicians from permitting another to use the physician's license to practice medicine, or from assisting another unlicensed person, or a partnership, association, or corporation in practicing medicine. Section 165.156 prohibits any unlicensed entity from indicating that it is authorized to practice medicine.

159.    Chapter 848 of the Texas Insurance Code prohibits physician noncompete agreements that might potentially inappropriately restrict a physician's practice of medicine.

160.    One of the main considerations in a CPOM case is whether the physician or a corporation is controlling medical decisions — in other words, courts consider the amount of control the (non-physician)   entity exercises over the doctor's practice and whether that control is such that it renders the relationship more of an employer/employee relationship.

161.    Oklahoma follows the same CPOM doctrine with its own state laws prohibiting the same. 59 Okl. St. §492 allows hospitals or related institutions to employ licensed medical practitioners without being regarded as practicing medicine. This statute also defines the practice of medicine and surgery, including advertising, prescribing, and treating medical. 59 Okl. St. § 622 similarly permits hospitals to employ licensed physicians without being considered as practicing osteopathic medicine. 59 Okl. St. § 495 outlines the issuance of licenses to practice medicine and surgery by the State Board of Medical Licensure and Supervision. 59 Okl. St. § 491 provides for administrative fines and penalties for practicing medicine without a valid license and for violations of the Oklahoma Interventional Pain Management and Treatment Act. 59 Okl. St. § 492 details the application process for medical licensure, including the requirements for demonstrating the ability to practice medicine safely. 59 Okl. St. § 493 includes definitions related to the practice of

medicine and the regulation of medical licensure under the Interstate Medical Licensure Compact. Title 59 of the Oklahoma Statutes also defines licensed professionals.

162.    Within the last seven years, Defendants, and each of them, embarked upon and or continued illegal, unfair, and deceptive business practices aimed at engaging and assisting others in the practice of medicine by forming and using licensed entities to accomplish the same, offering and paying consideration for patient referrals, controlling physician revenues and profits, restraining physician's ability to practice medicine through restrictive covenants and corporate financial policies, and false advertising, as described below.

163.    Under Delaware law, it is against public policy to enforce a contract that is illegal or requires a violation of law. Courts in Delaware will not enforce agreements that are void ab initio as against public policy. Additionally, contracts may be unenforceable if they are illegal per se or violate public policy.

164.    Rescission is a remedy that can be sought to unwind a voidable contract, aiming to return the parties to the status quo by abrogating or unmaking the agreement.

### *I.  APP Holdco, LLC's Intracontractual Fraud*

165.    The Purchase Agreement defines "fraud," in relevant part, as "willful and knowing fraud ... by ... (b) Buyer with the specific intent to deceive and mislead Member regarding the representations and warranties made in ARTICLE VI, as applicable."

166.    APP Holdco, LLC through its managers and their alter egos and parent companies willfully and knowingly affirmed in ARTICLE VI, that,

> "Buyer and Parent are each duly licensed or qualified to conduct business as a foreign limited liability company and are each in good standing in each jurisdiction where the character of their properties owned or held under lease or the nature of their activities makes such qualification necessary except where the failure to be so qualified or in good standing would not, with respect to each of the Buyer and Parent, individually or

in the aggregate, reasonably be expected to have a material adverse effect on Buyer, Parent or their respective operations. …"

But neither of them was.

167.    Indeed, the nonprofit corporation (APP EMERGENCY ED TX, INC.) and the professional LLC (APP Texas, PLLC) that were registered in Texas to operate several other medical LLCs that were controlling the Plaintiff's companies (to circumvent Texas CPOM rules) were illegally formed and operated. The non-profit company was prohibited from acting as the sole member of a Professional Limited Liability Company for the purpose of hiring physicians and controlling their emergency rooms and funds. The PLLC was also prohibited from doing the same because its member wase not a Texas physician.

168.    APP Holdco also willfully and knowingly affirmed that,

"Except as would not have a Material Adverse Effect, Buyer and Parent are, and since January 1, 2018 have been, in compliance with Healthcare Laws."

169.    In reality, APP Holdco was not in compliance with the Health Care laws in Texas as stated herein below.

170.    APP Holdco also willfully and knowingly affirmed that,

"Buyer and Parent have all necessary power and authority to execute, deliver and perform their obligations under this Agreement and each of the other Transaction Documents to which either of Buyer or Parent is a party and to consummate the Contemplated Transactions."

171.    The "Contemplated Transactions"    means "the transactions contemplated by the Purchase Agreement and the other Transaction Documents." Purchase Agreement at p.4. The Transaction Documents include "[the Purchase] Agreement, the Escrow Agreement, the Soria Employment Agreement, the Restrictive Covenant Agreements, the Subscription Agreement and all other agreements, certificates, documents and instruments required to be delivered pursuant to th[e Purchase]    Agreement." Id at p.10.

172.    The documents include the Soria Employment Agreement attached as Exhibit C to the agreement, entered into between Soria and APP Management Co, LLC, the restrictive covenant agreement attached as Exhibit D to the agreement between Soria and APP Management Co, LLC, and the subscription agreement attached as Exhibit E to the agreement.

173.    But Defendants App Holdco, LLC and CPV APP Blocker, LLC (and their principals and directors and managers) failed to have     all the necessary power and authority to execute, deliver and perform their obligations under this Agreement and each of the other Transaction Documents because the agreements were each made in violation of Texas CPOM laws. Specifically, they did not have the authority to     enter a restrictive covenant with Soria or Darrigan pursuant to the CPOM laws in Texas. They also did not have authority to purchase and transfer operative control of the Emergency Room companies they purchased to companies without a physician actually overseeing the ER contracts.  They also did not have authority to enter into the Employment Agreements with Soria and Darrigan through their subsidiaries APP Management Co., LLC and APPTexas ED, PLLC, respectfully.

174.    The Defendants were well aware of the Healthcare Regulatory laws but warranted that they were authorized and empowered to make these purchases anyway. *See* the Agreement at pp.28-31.

### J.  *Fraudulent Inducement of the Principals and Their Agents and Sub-Agents*

175.    The Private Equity Defendant owners, their agents and sub-agents who acted as sponsors and investors of the Contracting Defendants, APP Holdco, LLC and CPV APP Blocker, LLC were at all times complained of herein in direct control of the statements made in the purchase agreements and each of their transactional documents.

176.    These Defendants directed and conspired with the Contracting Defendants to use contracts they already possessed, as forms to be edited for the Purchase Agreement and other Transactional Documents referred to therein.   All these Defendants knew the statements in the Purchase Agreement set forth above were false, but allowed them to be presented to the Doctor Plaintiffs anyway to help grow their monopoly of ERs in Texas, Oklahoma, and Florida.

### K.  Tolling Facts

177.    APP Holdco, LLC made specific promises that it was not in violation of CPOM laws, that the Purchase of Plaintiff Companies would not violate the CPOM laws, and how APP Holdco, LLC would be vigilant     about any changes in the CPOM laws to avoid violating them, and the Plaintiffs reasonably relied on these promises. Because APP Holdco, LLC made specific promises that it was at all times solvent and owned assets greater than its debts, the Plaintiffs likewise reasonably relied on them.

178.    The Individual Defendants Rutledge, McQueen and Briningstool continued to make these promises after the Purchase Agreement, in 2020, 2021, 2022, and 2023 to the Individual Plaintiffs.

179.    As such, the Plaintiffs had no reason to suspect that the Plaintiff Companies would be owned (through their agents and sub-agents and shell companies) by the private equity Defendants. Especially since the purchase agreement did not include a list of the Unit Holders. Indeed, most of the schedules from the Purchase Agreement were withheld from the Individual Plaintiffs, including those that might have shown the members of APP Holdco, LLC or American Physician Holdings, LLC.    Defendants Rutledge, McQueen and Briningstool specifically represented APP Holdco LLC and American Physician Holdings, LLC as fully doctor-owned companies.

180.    Plaintiffs also had no reason to believe APP Holdco, LLC and American Physician Holdings, LLC were insolvent at the time of the purchase, or any way to discover    that fact on their own.

181.    Plaintiffs could not have known about the financial problems at APP Holdco, LLC and American Physician Holdings, LLC until news of their insolvency leaked to a website in December 2021. However, Plaintiffs did not see that news in 2021. Plaintiffs first became aware of the possible financial problems at App Holdco, LLC and American Physician Holdings in early 2023 when those Defendants directed Plaintiff Companies to cut staff when the ERs were most busy, and when those Defendants ordered the remaining staff to work extremely long shifts in opposition to the physicians' opinions.

182.    But after APP filed for c    hapter 11 b    ankruptcy in August of 2023, Plaintiffs were first able to see that the company was in debt in the amount of approximately $678,700,000. Plaintiffs were also able to see the organizational charts that showed one doctor (Briningstool) as owner of all the companies that held the shares in all    the medical groups in seventeen states. Plaintiffs also learned that all    those companies were owned by another company, American Physician Holdings, LLC, which was not doctor owned, and that APH, LLC was owned and operated by the Private Equity Defendants described herein.

183.    Upon learning of the ownership of the Plaintiff Companies by non-licensed entities, Plaintiffs began looking at the ownership of all    the entities in the organization and were shocked to find that Briningstool had actually been replaced by an attorney (Defendant McQueen) not long after the original Purchase Agreement was executed    in 2020.

184.    Plaintiffs filed their "Original Petition" in Dallas, Texas on October 25, 2023, two months after the bankruptcy was filed.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Request for Declaratory Relief Against All Defendants)

185.    Plaintiffs reallege and incorporate    by reference each allegation as if fully stated herein.

186.    Defendants transact business by operating controlled Medical Companies, Physician Groups and Management Services Companies as described herein.

187.    The violations of law described in this Complaint have been carried out and directed in part within the State of Texas and the State of Oklahoma, and anywhere else American Physician Partners did business.

188.    In the Purchase Agreement, the Contracting Defendants, and their Principles, Sponsors and Investment Defendants warranted to the Plaintiffs the following:

> "**6.9 Compliance with Healthcare Laws.** Except as would not have a Material Adverse Effect, Buyer and Parent are, and since January 1, 2018 have been, in compliance with Healthcare Laws."

Defendants defined "Healthcare Laws" as:

> "all Laws related to the provision, administration, management and/or payment for health care or healthcare-related products, services or professionals, applicable to the Companies and the Business, including all Laws, as amended from time to time relating to: (a) Medicare, Medicaid, and other Governmental Healthcare Programs; (b) the coding, coverage, reimbursement billing, administration or submission of claims, benefits or refunds to patients and third party payors, including employer-sponsored, private, and commercial payors and Governmental Healthcare Programs; (c) insurance and managed care; (d) fraud and abuse, bribes, rebates, kickbacks, referrals, corporate practice of medicine, false claims, fee splitting, patient brokering, including the following Laws and all rules and regulations promulgated pursuant thereto, each as amended: the False Claims Act (31 U.S.C. §§3729 et seq), the Civil Monetary Penalties Law (42 U.S.C. §1320a-7a), the federal Antikickback Statute (42 U.S.C. §1320a-7(b)), the federal Stark Law (42 U.S.C. §1395nn), the Program Fraud Civil Penalties Act (31 U.S.C. §3801 et seq.), the Federal Health Care Fraud law (18 U.S.C. §1347), the Federal Conspiracy to Defraud Statute (18 U.S.C. §286), the Federal False Statements Statute (18 U.S.C. §1001), and all state equivalents thereto; (e) medical records and patient privacy and security Laws, including HIPAA; (f) professional licensing, conflicts of interest, professional responsibility and standards of care; (g) Emergency Medical Treatment & Labor Act (Social Security Action §1867), as amended, and any

51

regulations promulgated thereunder and (h) any other Laws relating to healthcare providers or facilities, each as amended from time to time."

189.    In direct violation of the above promise and warranty, the Contracting Defendants, along with the Principal and Private Equity Defendants:

a. Unlawfully engaged in and aiding and abetting the unlawful Corporate Practice of Medicine within the State of Texas and Oklahoma in violation of both states' CPOM laws.

b. Unlawfully formed professional corporations, and professional limited liability companies and non-profit corporations so as to cause violations of those laws, or any applicable rules and regulations, relating to fee splitting, kickbacks, or other similar practices by physicians and surgeons.

c. Unlawfully offered or paid consideration for the acquisition or retention of emergency department exclusive contracts, and/or aiding and abetting in the same.

d. Unlawfully restrained the practice of medicine by requiring physicians to execute illegal restrictive covenants to restrict their employment.

190.    A present case and controversy exist regarding Defendants' practices of violating the ban on the corporate practice of medicine, using restrictive covenants, and offering remuneration in exchange for patient referrals, and whether the contract was void *ab initio* because the Plaintiffs are still incurring losses and damages in the form of tens of millions of dollars of phantom income as the reorganization of APP continues.

191.    That Defendants have engaged in unlawful conduct is clear from the above allegations that Defendants have violated the corporate practice of medicine ban in Texas and Oklahoma.

192.    Accordingly, Plaintiffs seek a declaratory judgment that the Purchase Agreement and its transactional documents were void *ab initio* for illegality due to the central purpose of the contract: Defendants' violation of the corporate practice of medicine doctrine. Plaintiffs seek a declaration that the purchase agreement was invalid from the beginning and never had any legal effect.

193.    The illegal terms concerning Healthcare Laws were central to the agreement, and the parties did not intend for the lawful terms to be severable. Indeed, there could be no contract to sell the Plaintiff Companies to Contracting Defendants without violating the corporate practice of medicine doctrine. The illegality is clear and certain.

## SECOND CAUSE OF ACTION
(Breach Of Duty of Loyalty by Director, Officer, Sponsor & Investor Defendants and their Principal Defendants)

194.    Plaintiffs reallege and incorporate by reference each allegation as if fully stated herein.

195.    APP Holdco, LLC's Operating Agreement affirmed that the "Officers of the Company, in the performance of their duties as such, shall owe to the Company and the Members duties of loyalty and due care of the type and to the extent owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware." The Operating Agreement also allowed for claims against managers and officers of APP Holdco, LLC for breaches of law.

196.    Defendants Rutledge, McQueen, and Briningstool were each an officer of APP Holdco, LLC, along with CPV APP Blocker, LLC and its principals BBH Capital Partners V, LLC, BBH Capital Partners, L.P., Brown Brothers Harriman Co., Brown Brothers Harriman & Co., and BCP II, LLC and its principal Blackstone Capital Partners, as well as Brentwood Capital Partners, L.P. II and its principals, Brentwood Equity Management, LLC and Brentwood Capital Advisors, LLC. As stated above, each of these officers were under the complete control of their principals and were formed as a shell company to block the principal from litigation and tax issues, whether legal under the tax code or not. None of the controlled officers were capitalized or held funds

themselves, as any funds earned from the illegal contracts were distributed directly to their principal Defendants.

197.     Each of the Defendants acted in bad faith when they drafted, approved the language in, presented and signed the Purchase Agreement in this case because they all knew the contract would violate the CPOM laws immediately upon execution. Indeed, the contract included a very detailed statement about how the contract might breach those laws—while warrantying that it did not.

198.     These Defendants agreed to the purchase agreement and operating agreements that they knew were made specifically to violate the law because it would earn them millions of dollars in self-interested income, distributions, and interest payments from Hospital payments and subsidies.

199.     As a direct result of the Purchase Agreement and subsequent failures to run the APP group in a lawful way, the entire group of medical companies was given away to other companies as APP filed for bankruptcy     liquidation. Furthermore, the Physician Plaintiffs lost their income from thirteen medical companies in three states, as well as their losses of expectation income and future damages.

200.     The duty of loyalty requires that directors act in the best interests of the LLC and its members, prioritizing these interests over any personal interests. These Defendants breached that duty when     they ran the companies illegally in order take funds for themselves, engaging in transactions that benefited themselves at the expense of the LLC, and failing to act in good faith.

THIRD CAUSE OF ACTION

(Breach of Duty of Due Care by Director, Officer, Sponsor & Investor Defendants and their Principal Defendants)

201.     Plaintiffs    reallege and incorporate    by reference each allegation as if fully stated herein.

202.     APP Holdco, LLC's Operating Agreement affirmed that the "Officers of the Company, in the performance of their duties as such, shall owe to the Company and the Members duties of

loyalty and due care of the type and to the extent owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware."

203.    Defendants Rutledge, McQueen, and Briningstool were each an officer of APP Holdco, LLC, along with CPV APP Blocker, LLC and its principals BBH Capital Partners V, LLC, BBH Capital Partners, L.P., Brown Brothers Harriman & Co., as well as Brentwood Capital Partners, L.P. II and its principals, Brentwood Equity Management, LLC and Brentwood Capital Advisors, LLC. As stated above, each of these officers were under the complete control of their principals and were formed as a shell company to block the principal from litigation and tax issues, whether legal under the tax code or not. None of the controlled officers were capitalized or held funds themselves, as any funds earned from the illegal contracts were distributed directly to their principal Defendants.

204.    These Defendants, and through their agents, sub-agents, and principals, breached their duty of due care by a director of a Delaware LLC. These Defendants, acting in concert and in conspiracy with one another, acted on an inadequately informed basis, at best. These directors either did not inform themselves of all material information reasonably available to them before making    the business decision in issue, or worse, it was intentional.

205.    To have agreed to state APP Holdco, LLC would operate pursuant to the "Healthcare Laws" while also defining the corporate practice of medicine laws in the same document, and then immediately transferring ownership of the medical company Plaintiffs to a company that was not owned and controlled solely by physicians, the Defendants are liable for their violations of their duty of care These Defendants exhibited conduct that constitutes reckless indifference or actions that are without the bounds of reason.

206.    As a direct result of the Purchase Agreement and subsequent failures to run the APP group in a lawful way, the entire group of medical companies was lost to other companies as APP filed for bankruptcy liquidation. To make matters worse, the Plaintiffs were forced to incur tens of millions of dollars in phantom income tax liability each year after they were defrauded into taking the worthless APP Holdco, LLC units. Furthermore, the Physician Plaintiffs lost their income from thirteen medical companies in three states, as well as their losses of expected income and future damages.

FOURTH CAUSE OF ACTION
(Breach Of Duty of Good Faith and Fair Dealing by Director, Officer, Sponsor & Investor
Defendants and their Principal Defendants)

207.    Plaintiffs    reallege and incorporate    by reference each allegation as if fully stated herein.

208.    Delaware law allows for the limitation or elimination of fiduciary duties in the LLC agreement, but it cannot eliminate the implied contractual covenant of good faith and fair dealing. This covenant requires that managers and directors act with honesty of purpose and genuine care for the interests of the LLC and its members.

209.    By undertaking the Purchase Agreement's purpose, Director, Officer, Sponsor & Investor Defendants and their Principal Defendants acted with the intent to violate applicable law, specifically the CPOM laws in each state. The Contracting Defendants acted with the same intent when they executed the Purchase Agreement.

210.    Furthermore, the Plaintiffs could not have known APP Holdco, LLC and American Physician Holdings, LLC was not owned by licensed physicians, nor that any of the other APP shell companies were not owned by physicians. The Plaintiffs were also unable to learn that all of the shell companies (shown in the chart above) were initially owned by a single licensed doctor (Defendant Briningstool) who could not have overseen the medical companies as he was required

to under Texas and Oklahoma law. Plaintiffs were further left in the dark by not knowing Defendant Briningstool transferred ownership of many of the shell "doctor owned" companies out of his name, in many cases into the name of an attorney, Defendant McQueen.

211.    These Defendants were not advancing the best interests of the APP companies, including APP Holdco, LLC and American Physician Holdings, LLC, because they acted with the intent to violate the CPOM laws, and/or intentionally failed to act in the face of a known duty to act, demonstrating a conscious disregard for their duties.

212.    These Defendants did not act in good faith or on the advice of counsel regarding this matter. Indeed, Plaintiffs believe these Defendants, in conspiracy and agreement, acted against counsel's advice in setting up all the shell companies under one doctor for the first three years and then transferring those companies back to APP.

213.    As a direct result of their failures to run the APP group in a lawful way, these Defendants caused the Plaintiffs to lose the entire group of medical companies to other companies as APP filed for bankruptcy reorganization. Simultaneously, the Plaintiffs were forced to incur tens of millions of dollars in phantom income tax liability. Furthermore, the Physician Plaintiffs lost their income from thirteen medical companies in three states, as well as their losses of expected income and future damages.

## FIFTH CAUSE OF ACTION

(Fraudulent Inducement by Contracting Defendants, their Directors, Officers, Sponsors & Investor Defendants, and their Principal Defendants)

214.    Plaintiffs    reallege and incorporate    by reference each allegation as if fully stated herein.

215.    Contracting Defendants, and their directors and managers and their principals, all Defendants herein, made several contractual representations and covenants ensuring the Plaintiffs that the Purchase Agreement was legal, including, among other promises and warranties, that:

> "…are each duly licensed or qualified to conduct business as a foreign limited liability company and are each in good standing in each jurisdiction where the character of their properties owned or held under lease or the nature of their activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not, with respect to each of the Buyer and Parent, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer, Parent or their respective operations." PA at §6.1.

> "…have all necessary power and authority to execute, deliver and perform their obligations under this Agreement and each of the other Transaction Documents to which either of Buyer or Parent is a party and to consummate the Contemplated Transactions… No other limited liability company or other action on the part of Buyer or Parent or any of their members is necessary to authorize the execution and delivery by Buyer or Parent of this Agreement and the other Transaction Documents to which either Buyer or Parent is a party, the performance of Buyer's and Parent's obligations hereunder or thereunder or the consummation by Buyer and Parent of the Contemplated Transactions." PA at §6.2.

And that:

> "The execution and delivery of, and the performance of their obligations under, this Agreement by Buyer and Parent do not, and the consummation by Buyer and Parent of the Contemplated Transactions or by any of the other Transaction Documents to which Buyer or Parent is a party will not… result in a violation of… any material laws…applicable to Buyer, Parent, or any of their assets, properties, or businesses …" PA at §6.3.

> "There are no Governmental Orders to which Buyer, Parent or any of their Affiliates, or any of their respective assets, properties or businesses is subject or bound, that would reasonably be expected to adversely affect in any material respect the ability of Buyer or Parent to enter into, perform its obligations under and consummate the Contemplated Transactions." PA at §6.4(c).

> "Buyer and Parent shall (a) be able to pay their respective debts as they become due; (b) own property which has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on their respective businesses." PA at §6.6.

"Except as would not have a Material Adverse Effect, Buyer and Parent are, and since January 1, 2018 have been, in compliance with Healthcare Laws." PA at §6.9.

"Upon the Initial Subscription, for purposes of and in accordance with the LLC Agreement, the amount of Investor's initial Capital Contribution (as defined in the LLC Agreement) to the Company in consideration of such Physician Units attributable thereto shall be $4.50 per Physician Unit (the "Initial Subscription Purchase Price")."

"The Company, at its expense, with the cooperation of Executive, will procure professional liability insurance, including tail coverage or post termination coverage, as applicable based on the Company's insurance policy, covering services rendered by Executive pursuant to this Agreement in sufficient limits as required by applicable state law or a facility's medical staff bylaws." ¶10 to Exhibit C of the Purchase Agreement.

216.    Defendants, in conspiracy with one another and as agents and sub-agents of their principals, misrepresented and concealed information regarding each of the above warranties and promises to induce the Plaintiffs into the Purchase Agreement. These misrepresentations go beyond a mere intention not to comply with the terms of the Agreement. The Purchase Agreement would immediately be in violation of CPOM laws upon signing. And Defendants knew the value of the units was not $4.50.

217.    Under Delaware law, corporate officials, including directors and officers, can be held individually liable for their fraudulent or tortious acts even if they were acting in their official capacities for the corporation at the time the fraudulent act was committed. This is supported by the personal participation doctrine, which states that an agent who performs tortious fraud is not excused from personal liability solely because they acted on behalf of a principal. The doctrine applies if the agent actively participates, consents, or ratifies a tortious scheme.

218.    In this case, the Contracting Defendants, acting under the control of their majority unit holders, (CPV APP Blocker, LLC, Rutledge, McQueen, Briningstool, and Brentwood Capital Partners, L.P. II) and those entities' principals, as their agents and sub-agents, all Defendants

herein, falsely represented each of the material fact shown above. They made the misrepresentations with knowledge or belief that the representation was false, with the intent to induce the Plaintiffs to enter into the Purchase Agreement, resulting in justifiable reliance by the Plaintiffs. They actively participated in or ratified the misrepresentations that induced the Plaintiffs to enter into the Purchase Agreement for the end goal of rolling up as many medical companies as possible before being forced to sell the whole group for the violations of the CPOM laws. The Principals of the Contracting Defendants as well as their directors were each involved in making the false representations.

219.    The Plaintiffs were damaged    consequently, as already set forth above.

## SIXTH CAUSE OF ACTION
### (Breach of Contract against Contracting Defendants)

220.    Plaintiffs reallege and incorporate by reference each allegation as if fully stated herein.

221.    Plaintiffs also sue for breach of the contract via intra-contractual promises and post contractual promises.

222.    The Purchase Agreement was a valid agreement that was in place between the Contracting Parties. The contract's Exhibit C contained specific representations and warranties that were agreed upon by both parties. The Contracting Defendants breached their obligations imposed by the contract. Specifically, the Contracting Defendants failed to obtain tail insurance, as promised through their shell companies, APP Management Co., LLC and APPTexas ED, LLC.

223.    The breach caused the Plaintiffs to incur personal liability for the cost of the tail insurance for themselves and any other physicians they worked with immediately after Defendants breached the promise in the amount of $950,000.00.

## SIXTH CAUSE OF ACTION
### (Texas Blue Sky Law Violations against All Defendants)

224.    Plaintiffs reallege and incorporate by reference each allegation as if fully stated herein.

225.    Defendants Rutledge, McQueen and Briningstool, under the direction of the other private equity Defendants, also violated the Texas Blue Sky Laws, Art. 581-33, by aiding and abetting, and conspiring with Brown Brothers Harriman, and Brentwood, and their agents, and sub-agents, Defendants herein, to sell APP Holdco, LLC shares, a security, by means of an untrue statement of a material fact and/or by omitting to state a material fact necessary in order to make the statements they did make, in the light of the circumstances under which they were made, not misleading.

226.    As a result of Defendants' actions and omissions, Plaintiffs have suffered damages. Defendants are each control persons or aiders and abettors under the act and are therefore liable in these capacities.

SEVENTH CAUSE OF ACTION
(Florida Blue Sky Law Violations against All Defendants)

227.    Plaintiffs reallege and incorporate by reference each allegation as if fully stated herein.

228.    Defendants Rutledge, McQueen and Briningstool, under the direction of the other private equity Defendants, also violated the Florida Blue Sky Laws, Chapter 517 of Florida Statutes, by aiding and abetting, and conspiring with Brown Brothers Harriman, and Brentwood, and their agents, and sub-agents, Defendants herein, to sell APP Holdco, LLC shares, a security, by means of an untrue statement of a material fact and/or by omitting to state a material fact necessary in order to make the statements they did make, in the light of the circumstances under which they were made, not misleading..

229.    As a result of Defendants' actions and omissions, Plaintiffs have suffered damages. Defendants are each control persons or aiders and abettors under the act and are therefore liable in these capacities.

EIGHTH CAUSE OF ACTION
(Delaware Securities Act Violations against All Defendants)

230.    Plaintiffs reallege and incorporate by reference each allegation as if fully stated herein.

231.    Defendants Rutledge, McQueen and Briningstool, under the direction of the other private equity Defendants, also violated the Delaware Securities Act, by aiding and abetting, and conspiring with Brown Brothers Harriman, Blackstone, and Brentwood, and their agents, and sub-agents, Defendants herein, to sell APP Holdco, LLC shares, a security, by means of an untrue statement of a material fact and/or by omitting to state a material fact necessary in order to make the statements they did make, in the light of the circumstances under which they were made, not misleading..

232.    As a result of Defendants' actions and omissions, Plaintiffs have suffered damages. Defendants are each control persons or aiders and abettors under the act and are therefore liable in these capacities.

CONCLUSION

WHEREFORE, Plaintiffs pray    for:

a.    A declaration that the practice of causing controlled Professional Medical Corporations to enter into, implement, and enforce restrictive covenants on the Plaintiff Physicians was unlawful and that the restrictive covenants are void CPOM laws;

b.    A declaration that the practice of offering to or agreeing to provide Hospitals with personnel to staff departments without the requirement of a subsidy (where subsidies are normally paid) in exchange for Emergency Department contracts constitutes violations of CPOM laws;

c.  A declaration that the control over medical professional corporations by lay entities constitutes the corporate practice of medicine in violation of CPOM laws;

d.  A declaration that the Purchase Agreement was void *ab initio*;

e.  Damages, both general and special and expected;

f.  Attorney s' fees as allowed by law;

g.  For such other and further relief as the court may deem proper.


Dated: August 5, 2024                    Respectfully submitted,


                                         **FAEGRE DRINKER BIDDLE & REATH LLP**

                                         By: */s/ Patrick A. Jackson*
                                             Patrick A. Jackson (No. 4976)
                                             222 Delaware Avenue, Suite 1410
                                             Wilmington, DE 19801
                                             Telephone: (302) 467-4200
                                             Facsimile: (302) 467-4201
                                             patrick.jackson@faegredrinker.com

                                             &

                                         **ALLEN & ASSOCIATES**

                                             Adam Allen (*pro hac vice* pending)
                                             Texas Bar No. 24031124
                                             Email:  adam@aallenlaw.com
                                             2777 Allen Parkway, Suite 1000
                                             HOUSTON, TX 77019
                                             Tel. (832) 871-5920
                                             Fax. (281) 503-7671

                                             Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick A. Jackson hereby certify that on August 5, 2024, a true and correct copy of the

within document was served via CM/ECF upon the following counsel of record:

| | |
|---|---|
| Michael C. Heyden, Jr.<br>Joseph E. Brenner<br>Gordon Rees Scully Mansukhani, LLP<br>824 N. Market Street, Suite 220<br>Wilmington, DE 19801<br>mheyden@grsm.com<br>jbrenner@grsm.com | Loren R. Barron<br>Kaufman Dolowich<br>222 Delaware Avenue, Suite 720<br>Wilmington, DE 19801<br>loren.barron@kaufmandolowich.com |

August 5, 2024                     */s/ Patrick A. Jackson*
                                    Patrick A. Jackson